## APPEAL OF S. A. CONOVER CO.

Docket No. 3926.   Promulgated March 31, 1927.

Petitioner held to be entitled to classification as a personal service corporation.

*Walter J. Goggin*, *C. P. A.*, for the petitioner.
*J. Arthur Adams*, *Esq.*, for the Commissioner.

### FINDINGS OF FACT.

For about twenty years prior to 1916, S. A. Conover had been engaged in sales promotion and advertising connected with the firm of N. W. Ayer & Sons Co. In 1916 he accepted an offer from L. C. Chase & Co. to furnish them advertising and sales service for which he was to be paid an annual salary and a commission upon their advertising. For some weeks Conover worked in their offices, then having no office of his own. He made a survey of their business, visited their mills and branch offices, and interviewed the trade and the jobbers for the purpose of ascertaining the extent of their market. He devised several trade-marks for use on their goods and changed others previously in use. He prepared sales plans, took photographs of the manufactured products, and later prepared advertisements for use in various publications. During the course of this work Conover gave up his desk in the office of Chase & Company and established his own office.

On May 1, 1920, the taxpayer corporation was organized to take over Conover's business, principally for the purpose of permitting

three employees to obtain an interest. At that time $15,000 par value of preferred stock was issued to Conover for $13,000 cash, being the accumulated profits of his business, and for furniture and fixtures valued at $2,000. Common stock, having a par value of $75,000 divided into 3,000 shares of $25 each, was issued to him for good will. Sixty shares of such common stock were issued to former employees of Conover who continued with the corporation, such stock being subject to a trust agreement under which Conover or the company had the right to repurchase at any time. All of the stockholders were actively engaged in the conduct of the business. The only employee was a stenographer and bookkeeper who was paid a salary of $100 per month. The stockholders drew salaries in 1920 of approximately $18,000. Conover supervised all of the operations of the taxpayer.

Taxpayer had few clients and the placing of advertisements was only a part of the service rendered to them. The services rendered in 1920 were substantially the same as those rendered to Chase & Company by Conover in 1916, which are described above. Before any steps were taken to advertise the business of a new client, an extensive study of the market for its products, as well as a study of its sales force, was made. Frequently changes in the sales force or method of selling were recommended and in some instances Conover suggested the names of persons to be put in charge of sales or of particular phases of the sales projects. After such study, a report of the result would be submitted to the client, together with suggestions as to the form of advertisements, the medium to be used, the character of the advertising, the amount to be expended, and similar matters. Photographs to be used were prepared and submitted as a part of the proposed advertisements. Frequently, if the advertising were newspaper or magazine advertising, the newspaper or magazine, with name and amount to be expended in each, was fixed. In some instances the service consisted in the preparation of a pamphlet or catalogue. The suggestions submitted by the taxpayer were either approved, rejected, or modified by the client and thereafter orders were placed by the taxpayer for the insertion of the advertising in accordance with the plan adopted, or, if the advertising took the form of catalogues or circulars, orders for these were placed by the taxpayer with the printers.

Taxpayer's contracts with its clients provided for a retainer fee and also for 15 per cent upon the amount expended for advertising, printing or other publicity. The only written contract for the service of the taxpayer in 1920 was as follows:

We authorize you to act as our Advertising Agency from December 1, 1920, and thereafter until three months' notice is given by either party of their desire to discontinue this arrangement in accordance with the last paragraph.

You are to place all of our advertising, and such printing as is necessary. You are to furnish all drawings, plates, composition, photos, electros and other material.

Your compensation on above services is to be the standard Agency Commission of 15% of the gross charges which you bill to us.

In addition to this, we are to pay you a Service Fee of $100.00 per month. In return for this fee you are to give us the benefit of the experience of your organization in devising ways and means to promote the sale of our products.

Postage, carriage on electros, drawings, etc., are to be charged us at cost.

Bills will be rendered to us monthly. We will pay same in full each month, within ten days from date of bill. You are to allow us the actual amounts of Cash Discounts allowed you by the parties with whom you do business on our account.

At the expiration of three months from the above date, a mutual adjustment in the Service Fee may be made for a future period. This fee is to be based on the volume of work necessary.

(Dated) November 29, 1920.

In placing orders for advertising space the name of the client was invariably used. The form in general use by the taxpayer during 1920 was as follows:

S. A. CONOVER COMPANY
24 MILK STREET
BOSTON, MASSACHUSETTS
ADVERTISING

(Name of publication)

Please insert advertising of (name of client) as follows:
(Here follow instructions with reference to the date of publication, space, position and other instructions with reference to the advertising.)

S. A. CONOVER COMPANY.

The copy for the advertisements was furnished the publication by the taxpayer after it had been prepared by the taxpayer and approved by the advertiser.

Bills were rendered to the taxpayer for such advertising and for printing, photographing, engraving and other services. In the case of advertising, discounts from the regular rates were allowed taxpayer as a regular agency. Upon receipt by the taxpayer of bills the amount of the deduction allowed to it as an agency was subtracted, arriving at the net amount to be paid and the publisher, printer, photographer or engraver, and the client would be billed for such net amount plus 15 per cent. This procedure was regularly followed whether the bill was for advertising or for printing, or for other expenditures and whether or not a discount was allowed to the taxpayer. Bills were received by the taxpayer upon the first of each month and rendered to its clients shortly thereafter. In most instances payment was received from the client before it was due to the publication or printer, but frequently payments were

made by the taxpayer before they were received from its clients. This was done in order to enable the taxpayer to take advantage of cash discounts given for prompt payment, usually 2 per cent. A similar cash discount was allowed clients if the bills were paid promptly.

Gross income from commissions during 1920 was $28,959.69, representing commissions upon approximately $200,000 of business placed during the period from May 1 to December 31, income from retainer fees was $1,750, and from interest $894.34. This last item included $808.70, the difference between the cash discounts received and the cash discounts allowed to clients. The expenses for 1920, other than salaries, were $2,999.

The assets and liabilities on May 1, 1920, and on December 31, 1920, were as follows:

|  | May 1, 1920. | Dec. 31, 1920. |
|---|---|---|
| Assets: |  |  |
| Cash | $13, 000. 00 | $7, 393. 26 |
| Accounts receivable | | 27, 392. 97 |
| Furniture and fixtures | 2, 000. 00 | 2, 012. 50 |
| Liabilities: |  |  |
| Notes payable | | 10, 000. 00 |
| Accounts payable | | 2, 068. 10 |

Approximately $26,000 of the accounts receivable were due from Chase & Company.

Conover was well known to most of the publishers. No publication or association of publications requested taxpayer to furnish any financial statements. When space was desired the order was forwarded in the form quoted above. If the order covered space to be used in the future and the advertiser named in the order did not use the full space ordered, the amount used was charged at what is known as a " short rate " meaning thereby that if there was a differential in rate for the space used and the space contracted for, the space used was charged for at the rate which governed such amount of space, although previously billed at the rate governing the larger space order. The unused space contracted for by one advertiser and not used by him could not be used by another advertiser or client of the taxpayer, or otherwise disposed of by the taxpayer, nor could space be purchased in block or purchased without naming the advertiser in each instance.

## OPINION.

PHILLIPS: Taxpayer claims that it is entitled to classification as a personal service corporation under the provisions of section 200 of the Revenue Act of 1918. The evidence discloses that all of the stockholders of the appellant corporation were regularly engaged in the active conduct of its affairs and that the only other employee was a stenographer and bookkeeper. The only thing that the corporation had to sell was the service and advice of its stockholders and under the circumstances there can be no doubt that the income is to be ascribed primarily to their activities.

The income was not derived from trading as a principal. The evidence discloses that the corporation, whose principal income was from commissions upon advertising, did not purchase and sell advertising space in bulk but only placed orders for space as directed by its clients, in each case naming the client. Space contracted for but not used by the advertiser named could not be used by another advertiser or disposed of in any way by the advertising agent. It could only be canceled, in which event charge for the space already used would be recomputed upon the basis of the rate for such amount of space, known as the short rate.

We come then to consider the only remaining qualification required under the definition of a personal service corporation, namely: Is capital, (whether invested or borrowed) a material income-producing factor? It is not sufficient to defeat personal service classification that capital be used in the business or that capital be incidental to the production of the income. The capital must be a material factor in producing income. Capital must be of such use that the production of income would be materially lessened without it.

In this connection it is urged that the contract between the publisher and the advertising agent is such that the advertising agent is responsible for the payment of all bills for advertising, that recognition is extended only to agencies having good financial standing and that capital is necessary to obtain recognition as an agency and for use in paying for space used by advertisers.

It is our opinion that the matter of either the theoretical or legal liability, so long as the agent is not a principal dealing in the purchase and sale of space, has little to do with the question which we must decide. In determining whether capital is or is not a material income-producing factor, we must look to the use to which capital is put in the business. One agency, with no legal responsibility to pay the publisher for the advertising of its clients, may follow a consistent practice of making such payments and permitting credit facilities to its clients. This extension of credit may be such as to

balance the scales in its favor as against another such agency which will not finance the obligations of its clients. In such a case capital is so used as to be material in securing and retaining income-producing business. Under such circumstances, if used to produce sufficient business, capital becomes a material income-producing factor. Another agency may expressly contract with the publisher to make itself liable for the payment for the advertising of its clients; yet if it so operates its business that collections are promptly made from the clients and it becomes unnecessary to use its capital to perform the obligation it has undertaken, capital has not become a material income-producing factor. The use of capital has been potential only. The fact that a business has capital, or in certain contingencies might require capital, is not sufficient to deny personal service classification, if in fact capital is not used to produce income; the use to which capital is put is the controlling factor.

The evidence here discloses that during a period of eight months the corporation transacted business aggregating over $200,000, or $25,000 per month. The difference between the cash discounts received and the amount allowed to the clients was $808.70, which at the usual cash discount of 2 per cent would indicate that in eight months $40,000 had been paid to publishers prior to payment to the petitioner, an average of $5,000 per month. There were, however, other expenses incurred and paid on behalf of clients and the evidence would indicate the use of from $10,000 to $20,000 in the business. As to the balance sheet at the end of 1920, it appears that the accounts receivable represented the account of Chase & Company, a client who had originally retained Conover on a salary basis and desired his services, not for any credit he could extend, but because it had confidence in his ability.

The net income of the corporation, before payment of salaries, appears to have been $28,803.03. There was paid from this the salary of a stenographer, $100 per month for eight months, leaving $28,000 attributable to the services of stockholders and to capital. Average capital employed, whether invested or borrowed, was less than $20,000. Even this amount appears to have been unnecessary, and its use produced at most only $800 of income. Twice this amount was received from retainer fees, having no reference to the placing of any advertising or the payment of any bills.

In these days of magazines with a national circulation reaching into millions of copies and the cost of advertising space into thousands of dollars per page, the preparation of such advertising and the selection of the proper media in which it is to appear has come to be recognized as a business or profession requiring skill and experience, and it was in such business that the taxpayer was principally engaged. On the whole record we are of the opinion that

the primary income-producing factor was the experience and advice of Conover, that capital was not a material income-producing factor and that such capital as was used was merely incidental to the services rendered in planning and carrying out sales and advertising campaigns.

> *Decision will be entered for the petitioner on 10 days' notice, under Rule 50.*

MILLIKEN and STERNHAGEN concur in the result only.